**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket No. 16-CR-40025-TSH |
| (2) CARLOS JIMENEZ | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT CARLOS JIMENEZ'S MOTION TO SUPPRESS**

The United States of America, by and through its attorneys, United States Attorney Carmen M. Ortiz and Assistant United States Attorney Michelle L. Dineen Jerrett, submits this memorandum of law in opposition to the defendant Carlos Jimenez's ("Defendant" or "Jimenez") Motion to Suppress Evidence (the "Motion"). Defendant asserts that the legitimate constitutional bounds of his traffic stop were exceeded by law enforcement, entitling him *Miranda* warnings after those bounds were exceeded. Defendant asserts that without being given his *Miranda* warnings, (1) his consent to search the vehicle he was driving was invalid, and (2) law enforcement lacked probable cause to search the vehicle, and seeks suppression of all evidence gained from the vehicle stop. In addition, Defendant contends that the Cooperating Witness's ("CW") identification of his photograph should be suppressed.

For the reasons stated herein, Jimenez's Motion should be denied.

## RELEVANT FACTS

Defendant and his co-defendant, Ivan Cruz-Rivera (together, "the defendants"), are charged in a two-count indictment with Conspiracy to Possess with Intent to Distribute and to Distribute Heroin, in violation of 21 U.S.C. § 846, and Possession of Heroin with the Intent to Distribute and Distribution of Heroin, in violation of 21 U.S.C. § 841(a)(1). Specifically, the indictment alleges

that on or about October 4, 2013, in Leominster, Massachusetts, the defendants knowingly and intentionally conspired to possess with intent to distribute and to distribute 100 grams or more of heroin, and did distribute more than 100 grams of heroin on that same date.

A summary of the facts[1] underlying this charge is as follows:

### A. Pre-Stop Factual Background

In October of 2013, the U.S. Drug Enforcement Administration ("DEA"), Fitchburg Police Department, and the Bureau of Alcohol, Tobacco and Firearms ("ATF") had been involved in a months-long investigation of individuals suspected of trafficking in heroin in the Leominster area. Two individuals ultimately were charged with controlled substances violations, including distribution of heroin on October 4, 2013. One of those individuals (referred to herein as "CW") later began cooperating with law enforcement, although had not been a CW on October 4, 2013.

By October 2013, DEA had made a total of six controlled purchases of heroin from the CW's partner, "M.R."[2] On October 4, 2013, DEA was conducting surveillance of the garages located at 105/107 Union Street, Leominster, MA (the "105/107 Garages") in anticipation of trying to have a cooperating source ("CS") purchase heroin directly from the CW, who they believed had been supplying M.R. with heroin in the prior controlled purchases (A.00010-11). At approximately 12:06 p.m., the CS arrived at the 105/107 Garages, accompanied by an undercover officer (the "UC") (A.00011).[3] The UC vehicle and the CS were both outfitted with digital

---

[1] Notably, Jimenez nor Cruz-Rviera do not dispute the facts in this case as neither has submitted any affidavit challenging the facts as set forth in the discovery.

[2] The government does not believe that the details of the prior drug transactions are relevant for the Motion. In the event the court wishes to consider this evidence, however, the government reserves its right to supplement its opposition with an affidavit detailing additional facts of the prior drug transactions.

[3] References are to the Appendix filed under seal with Jimenez's Motion.

audio/video recording devices, and the CS also was outfitted with a digital audio transmitter for law enforcement monitoring in real-time of the CS's interactions with the CW (A.00010). DEA observed the CS meet with the CW outside one of the garage bays. The CW told the CS that the CW was waiting for the heroin to arrive / waiting for someone to bring it to him, and that he did not yet know the price but would give the CS a "good price" (A.00011). The CW told the CS that the heroin would be ready at approximately 1:30 p.m (Id.). During the meeting, the CW was on his cell phone, appearing to give directions to the 105/107 Garages (Id.)

At approximately 12:15 p.m., the CS and UC left the 105/107 Garages in the UC vehicle (Id.). At approximately 12:18 p.m., agents observed the CW exit the front garage bay and walk out to the street while talking on his cell phone (A.00012). The CW waved to a Gray Lexus bearing NJ registration D17CLD (the "NJ Lexus"), which slowed, pulled into the driveway, and pulled to the rear of the garages furthest from the street (Id.). Agents observed the CW walk inside the front garage bay, and walk out, closing the bay door at 12:20 p.m., then walk to the rear of the garage bays where the NJ Lexus had just parked (Id.). At approximately 12:34 p.m., law enforcement observed the CW's truck, being driven by an unknown male, pull to the rear of the garages where the NJ Lexus had parked (Id.). At approximately 12:53 p.m., agents observed the CW walking up from the rear garage and re-entering the front garage bay (Id.).

At approximately 2:09 p.m., law enforcement observed the NJ Lexus, occupied by two males, leaving the 105/107 Garages, and pull onto Union Street in Leominster, heading towards the center of Leominster (Id.). Approximately 2 minutes later, the vehicle made a U-turn and headed back towards the garage, while at the same time the CW exited the front garage bay, on his cell phone, and walked hurriedly towards Union Street (Id.). Agents observed the CW waving to the NJ Lexus and pointing towards another street, where the NJ Lexus then turned (Id.). Trp. Vitale, a

Massachusetts State Police task force officer with DEA who was involved in the investigation, followed the NJ Lexus until it went to Sturbridge (Id.).

Between 12:15 p.m. and approximately 2:20 p.m., the CS received and placed multiple calls to M.R., who relayed information to the CS on when to pick up the heroin from the 105/107 Garages (A.00002). During that time period, M.R. told the CS that the CW was making the heroin up for the CS and it would be ready in approximately 15 to 20 minutes (Id.). At approximately 2:25 p.m., the CS and the UC headed back to the 105/107 Garages, returning there at approximately 2:36 p.m. (A.00013). Law enforcement observed the UC vehicle pull into the driveway at the garages and pull in front of the first garage bay (whose door was closed) and then proceed to the rear garage bays where it pulled over and waited (Id.).

At approximately 2:48 p.m., agents observed the CW leave the front garage bay and walk towards the rear garages where the UC vehicle was parked (Id.). The CW went directly to the passenger side of the vehicle, and the CS opened the door and the CW gave him a small box in exchange for $7500 in cash (A.00002). The CW told the CS that he wore a mask and pointed to the outline of the mask around his face, explaining that the heroin went everywhere when it was mixed in the blender (A.00002-03). At approximately 2:50 p.m., law enforcement observed the UC vehicle leave the 105/107 Garages, and the CS relayed to agents that the deal was complete (A.00013). At approximately 2:55 p.m., the CS and the UC met up with law enforcement and the CS turned over the box containing the purchased heroin (Id.).

At some point prior to 3:17 p.m., Trp. Vitale communicated with Trp. DiCrescenzo, informing him that he (Trp. Vitale) was following a Lexus with NJ plates, providing the license plate and a description, that the car had come from Leominster, MA, and that it was believed to contain drugs, cash or both (A.48). Trp. Vitale told Trp. DiCrescenzo that the NJ Lexus was

traveling westbound on Interstate 90, and that he believed it would get on Interstate 84 traveling westbound (Id.). Trp. Vitale requested that Trp. DiCrescenzo stop the NJ Lexus, but also indicated that Trp. DiCrescenzo should establish his own basis for the stop (Id.).

Trp. DiCrescenzo, in a fully-marked MA State Police Cruiser, saw the NJ Lexus and began following it. (A.00006). At approximately 3:15 p.m., Trp. DiCrescenzo observed the NJ Lexus change lanes from the left lane to the middle lane without signaling (despite the close proximity of other vehicles) and then position itself within two to three car lengths of the vehicle in front of it while traveling at an estimated speed of 65 to 70 mph (Id.). Upon witnessing these traffic violations, Trp. DiCrescenzo effectuated a stop of the NJ Lexus (Id.).

**B. Facts Developed During the Car Stop**

When Trp. DiCrescenzo approached the vehicle and began talking to Jimenez about the reason for the stop, both occupants of the vehicle were extremely nervous (A.00006). Jimenez's hands were visibly shaking, and Cruz-Rivera was staring straight ahead, refusing to make eye contact, and fidgeting in his seat (and continued to do so during the trooper's interaction with Jimenez) (Id.) When Jimenez was removing his license from his wallet, the trooper could see his hand tremble (Id.) Jimenez produced his license and a firefighter badge (Id.) When asked where they were coming from, Jimenez stated "Lawrence" and explained they had been there for only a couple of hours visiting family (Id.). Jimenez explained they left NJ early in the morning to visit family in Lawrence where they stayed for approximately 2 hours and were heading back to NJ (Id.) Based upon the information from Trp. Vitale, Trp. DiCrescenzo knew that the vehicle had come from Leominster, not Lawrence. The trooper also asked Cruz-Rivera for identification (A.00007).

After checking the validity of the licenses and the vehicle's registration, Trp. DiCrescenzo returned to the car and asked Jimenez to step outside the car to discuss his trip further and

investigate potential contraband trafficking (Id.) Jimenez gave conflicting answers about which relatives he was visiting and was unable to provide an address of where they met (Id.) Jimenez then told the trooper that he was actually visiting his brother-in-law, not his cousin, but was unable to provide a name (Id.) Jimenez denied making any other stops along the way besides Lawrence and denied having any weapons or drugs in the car (Id.) Jimenez told the trooper that the passenger had "some money" although he was unsure of the amount, and claimed that Cruz-Rivera was looking to buy a truck (Id.) Jimenez could not explain why he failed to mention that previously (Id.) Trp. DiCrescenzo asked Jimenez to sit in the back of the cruiser while he questioned Cruz-Rivera, and Jimenez agreed (Id.) He was not handcuffed at any time (Id.)

The trooper approached Cruz-Rivera, asked him to step out of the car, and asked him some basic questions about the trip (Id.) Throughout the conversation, Cruz-Rivera was trembling and seemed very nervous (Id.) Cruz-Rivera denied making any stops besides Lawrence, MA and denied any weapons or drugs in the car (Id.) When asked whether there were any large sums of cash in the vehicle, Cruz-Rivera reached into his pocket, revealing a small amount of cash (Id.) He gave evasive answers as to whether that was all of the cash, and when Trp. DiCrescenzo told him that the driver stated there was money in the car, Cruz-Rivera stated he did not understand (Id.) Trp. DiCrescenzo then called a fluent Spanish speaking trooper to assist in translating (Id.) Cruz-Rivera told the troopers that there was one thousand dollars in the car and agreed to show Trp. DiCrescenzo (A.00007-08). Cruz-Rivera reached into the back seat of the vehicle and grabbed a black bag (A.00008). Cruz-Rivera attempted to use his body to block the trooper's view of the bag (Id.) Concerned for his safety, the trooper asked Cruz-Rivera to step to the side so the trooper could see the contents of the bag (Id.) Cruz-Rivera did not move to the side so the trooper pushed him to the side slightly to be able to see the bag, in which he observed multiple bundles of cash in a

manila folder inside the bag (Id.) Cruz-Rivera then removed one of the bundles and showed it to the trooper, but could not explain why he had so much cash (Id.) Trp. DiCrescenzo instructed Cruz-Rivera to wait by the side of the road, and he then returned to Jimenez, informed him of what he saw in the vehicle, and asked for consent to search (Id.) Jimenez consented to the search of the vehicle (Id.) Trp. DiCrescenzo located three cell phones in the vehicle, including one inside the black bag and two under the front passenger seat (Id.) The cash was bundled in twelve separate bundles with elastics, which in the trooper's experience was consistent with the proceeds of illegal narcotics (Id.) Thereafter, a K-9 drug sniffing dog responded to the scene and positively alerted to the black bag containing the money and to the money itself (Id.) When asked by the trooper why there was so much cash, Cruz-Rivera stated he was looking at a truck to purchase, which was inconsistent with earlier statements made by him and Jimenez (Id.)

## ARGUMENT

### I. Jimenez is Not Entitled to an Evidentiary Hearing

As a preliminary matter, "a hearing is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record." United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996); see United States v. Panitz, 907 F.2d 1267, 1273 (1st Cir. 1990) ("The facts for granting an evidentiary hearing in a criminal case should be substantive; did the defendant make a sufficient threshold showing that material facts were in doubt or dispute?"). Evidentiary hearings on motions to defendant are required only when a defendant alleges facts that are "sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." United States v. Lewis, 40 F.3d 1325, 1331 (1st Cir. 1994); see also United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993) (noting that "evidentiary hearings on motions are the exception, not the rule");

Panitz, 907 F.2d at 1273 ("[A] criminal defendant has no absolute or presumptive right to insist that the district court take testimony on every motion").

In this case, Jimenez filed no affidavit whatsoever in support of his Motion. In a motion to suppress, the defendant bears the burden of showing disputed facts to warrant an evidentiary hearing. As Jimenez filed no affidavit, and therefore failed to make a sufficient showing that material facts are in doubt, an evidentiary hearing is not warranted. This Court has sufficient information to make a decision on the papers.

## II. The Stop of the NJ Lexus was Lawful

### A. The Traffic Violation Provided Probable Cause to Stop the NJ Lexus

An officer may effectuate a vehicle stop if there is probable cause to believe that the driver has committed a traffic offense, even if the officer had an ulterior motive for the stop. Whren v. United States, 517 U.S. 806, 810, 813 (1996) (holding that an officer's subjective intentions immaterial to Fourth Amendment analysis); United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011) (concluding that traffic violations provided probable cause for a stop "which immunized the stop from attack even if [the officers'] true aim was to look for weapons").

Here, as detailed in the Incident Report (A.00004-09), Trp. DiCrescenzo saw the NJ Lexus change lanes without signaling and position itself within two to three car lengths of the car in front of it which was estimated to be traveling at 65 to 70 mph (A.00006). Although Jimenez complains in his Motion that the stop was "pretextual," he offers no affidavit or other evidence refuting the facts as set forth in the Incident Report, and consequently, the validity of the stop itself. There is no dispute that the trooper had probable cause to stop the vehicle because of the traffic violations.

### B. There Was Probable Cause to Believe the Occupants of the NJ Lexus were Involved in Criminal Activity

At the time of the car stop, agents and task force officers with the DEA had probable cause to believe that the occupants of the NJ Lexus were engaged in criminal activity. Applying the "collective knowledge" doctrine, Trp. DiCrescenzo was entitled to rely not only on the information directly communicated to him by Trp. Vitale, but also on the collective knowledge of all of the law enforcement officers involved in the DEA investigation.

The first inquiry is whether the DEA had probable cause to believe that the occupants of the NJ Lexus were engaged in criminal activity. The answer to this inquiry is yes. "Probable cause exists if, at the time of the arrest, the collective knowledge of the officers involved was sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." United States v. Link, 238 F.3d 106, 109 (1st Cir. 2001) (internal quotation marks omitted); see also United States v. Young, 105 F.3ed 1, 6 (1st Cir. 1997) ("Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime"); Texas v. Brown, 460 U.S. 730, 742 (1983) (*plurality opinion*) (probable cause "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.") (internal citation omitted). Probable cause is not equivalent to the proof beyond a reasonable doubt. See, e.g., United States v. Winchenbach, 197 F.3d 548, 555-56 (1st Cir. 1999) ("probable cause standard does not require the officers' conclusion to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable."); United States v. Melvin, 596 F.2d 492, 495 (1st Cir. 1979) ("Probable cause is 'reasonable cause,' something significantly less exacting than 'more likely than not' or 'by a preponderance of the evidence.'");

United States v. Ciampa, 793 F.2d 19, 22 (1st Cir. 1986) ("The standard of probable cause is the probability, not a *prima facie* showing, of criminal activity.") Probable cause "does not require the same level of certitude or quantum of proof that is necessary to convict . . . . Instead, probable cause exists when . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [individual] had committed or was committing an offense." Winchenbach, 197 F.3d at 555 (citations omitted).

In this case, at the time of the stop of the NJ Lexus, the following facts were known to law enforcement. First, DEA had been involved in a months-long investigation of individuals suspected of trafficking in heroin in the Leominster area. On the day of the stop in question, October 4, 2013, the CS went to the 105/107 Garages in an attempt to purchase 125 grams of heroin directly from the CW, one of the targets of the investigation. During the initial meeting between the CS and the CW, the CW said he was waiting for the heroin to arrive, that it would be ready at approximately 1:30 p.m., and that he was waiting for someone to bring it to him. In addition, during their meeting, the CW was on his cell phone talking to someone, appearing to give directions to the 105/107 Garages. Three minutes after the CS and the UC left the 105/107 Garages, agents saw the CW exit the front bay of the garage, on his cell phone, walk to the street and motion to the NJ Lexus, which subsequently pulled in and drove to the rear part of the 105/107 Garages. The CW, who had just told the CS that he was waiting for the heroin to arrive, then closed the front garage bay door and walked to the rear of the garages where the NJ Lexus had parked.[4]

---

[4] Jimenez notes in his motion that the CW's truck arrived at the 105/107 Garages approximately 15 minutes later. To the extent Jimenez may be suggesting that the source of the delivered heroin was whoever drove the CW's truck to the location, reasonable suspicion nevertheless existed relating to the NJ Lexus. See Winchenbach, 197 F.3d at 555-56 (debating defendant's alternate theories of drug source not useful as "probable cause standard does not require the officers' conclusion to be ironclad, or even highly probable.

Approximately 30 minutes later, law enforcement observed the CW walking up from the rear garage and re-entering the front garage bay. Just under two hours after it arrived, the NJ Lexus with its two occupants (subsequently identified as the defendants) left the 105/107 Garages. Agents observed the CW exit the garage, again on his cell phone, heading hurriedly towards the street while the NJ Lexus make a U-turn approximately two minutes after it left and head back towards the garage. The CW began waving to the NJ Lexus and motioning with his arm and pointing towards another street onto which the NJ Lexus turned. Thereafter, the NJ Lexus was followed by Trp. Vitale from Leominster until it was stopped by Trp. DiCrescenzo.

Between 12:15 p.m. (when the CS left) and when the NJ Lexus left, the CS spoke with the CW's partner who stated that the heroin had arrived and would be ready in approximately 15 to 20 minutes. The CS and the UC arrived back at the 105/107 Garages at approximately 2:36 p.m., and at approximately 2:48 p.m., agents observed the CW leave the front garage bay and walk towards the rear garages where the UC vehicle was parked. There, the CW gave a small box containing what was believed to be 125 grams of heroin to the CS in exchange for $7500 in cash. During the deal, the CW told the CS that he wore a mask and pointed to the outline of the mask around his face, explaining that the heroin went everywhere when it was mixed in the blender. By 2:50 p.m., law enforcement was aware that the heroin had been delivered, prepared, and sold.

C. Even if there was No Probable Cause Aside from the Traffic Violation, Trp. DiCrescenzo Most Certainly had Reasonable Suspicion for a *Terry* Stop

Even if the court were to determine that probable cause to believe the occupants of the car were engaged in criminal activity did not yet exist at the time of the car stop, certainly Trp. DiCrescenzo was justified in conducting a *Terry* stop. Terry v. Ohio, 392 U.S. 1, 19-20 (1968).

---

Their conclusion that probable cause exists need only be reasonable.")

A warrantless motor vehicle stop is reasonable under the Fourth Amendment if law enforcement has a reasonable and articulable suspicion of wrongdoing by the occupants of the car. United States v. Lee, 317 F.3d 26, 31 (1st Cir. 2003); see also United States v. Sokolow, 490 U.S. 1, 7 (1989). A traffic stop constitutes a seizure under the Fourth Amendment of both the vehicle and its occupants. See Brendlin v. California, 551 U.S. 249, 255 (2007) (noting that traffic stop is a seizure of the occupants even though for a limited purpose and time period); United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001). As such, a traffic stop must be objectively reasonable both in terms of the initial stop and the actions undertaken during the stop. See, e.g., Terry, 392 U.S. at 20; Chhien, 266 F.3d at 6 (police must have reasonable, articulable suspicion about individual's involvement in criminal activity in order to conduct *Terry* stop); United States v. Ruidiaz, 529 F.3d 25, 28-29 (1st Cir. 2008) (discussing that officer's actions during the stop "must be reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation") (quotations omitted).

To constitute reasonable suspicion, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002). Courts must look to the totality of the circumstances of each case. United States v. Cortez, 449 U.S. 411, 417 (1981); see also United States v. Arnott, 758 F.3d 40, 44 (1st Cir. 2014) (totality of circumstances includes, *inter alia*, "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers"); United States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987) (court must consider totality of the circumstances confronting the officer, which "are not to be dissected and viewed singly; rather [the circumstances] must be considered as a whole.") (quotations and citations omitted). "[E]ven innocuous facts, which when taken alone may not be 'sufficient to create reasonable suspicion[,] . . . may in

combination with other innocuous facts take on added significance.'" United States v. Am, 564 F.3d 25, 30 (1st Cir. 2009) (quoting Ruidiaz, 529 F.3d at 30).

Reasonable suspicion has no precise definition, having been described as abstract, Arvizu, 534 U.S. at 274, not finely-tuned, Ornelas v. United States, 517 U.S. 690, 696 (1996), and an "elusive concept," Cortez, 449 U.S. at 417. See also Ruidiaz, 529 F.3d at 29 ("While no perfectly precise definition of reasonable suspicion exists, it is well established that, in terms of the continuum of knowledge, reasonable suspicion requires more than a mere hunch but less than probable cause. "It follows, therefore, that no *direct* link between the suspect and the suspected criminal activity need be forged in order to achieve reasonable suspicion." Id., citing Chhien, 266 F.3d at 6. In United States v. Arnott, the First Circuit discussed reasonable suspicion as follows:

> Reasonable suspicion requires more than a naked hunch . . . but less than probable cause . . . . In the broad expanse between these two poles, the court's assessment must be made in light of the totality of the circumstances . . . [R]easonable suspicion is more a concept than a constant: it deals with degrees of likelihood, not with certainties or near certainties. It makes due allowance for the need for police officers to draw upon their experience and arrive at inferences and deductions that 'might well elude an untrained person.' . . . By like token, an appraisal of an officer's conduct after the initial *Terry* stop necessarily entails an element of flexibility: the officer 'may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention.'

758 F. 3d 40, 44 (1st Cir. 2014) (quotations and citations omitted).

Based upon the facts outlined above, even if this court were to conclude that probable cause did not yet exist (aside from the traffic violation), agents and task force officers with the DEA possessed, at a minimum, reasonable and articulable suspicion that the occupants of the NJ Lexus were engaged in criminal activity. See, e.g., Arnott, 758 F.3d at 44 (concluding that reasonable suspicion existed where DEA had been monitoring target's suspected drug activities for weeks, and intercepted telephone calls and pattern of similar activity along with observations made of two vehicles believed to be engaged in drug deal); United States v. Alix, 630 F.Supp.2d 145, 153 (D.

Mass. 2009) (finding reasonable suspicion where target was involved in drug dealing, car affiliated with the defendant was seen at target's house for drug transaction, information led law enforcement to believe that drug deal was to occur on day of car stop and surveillance placed car heading towards Massachusetts on day of planned deal).

D. DEA's Knowledge can be Imputed to Trp. DiCrescenzo under the "Collective Knowledge" Doctrine

Having established that DEA had probable cause, or at least reasonable suspicion, to believe that the car's occupants were involved in criminal activity, the inquiry becomes whether that knowledge can be imputed to Trp. DiCrescenzo. Here, too, the answer is yes.

The First Circuit has recognized that reasonable suspicion and/or probable cause can be established through the "collective knowledge" doctrine. See United States v. Paradis, 802 F.2d 553, 557 (1st Cir. 1986). Under that doctrine, "law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime." United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997). "The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another office or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." United States v. Williams, 627 F.2d 247, 252 (7th Cir. 2010); see also United States v. Fiasconaro, 315 F.3d 28, 36 (1st Cir. 2002) (the focus is on the aggregate knowledge possessed by all of the officers involved in the investigation).

Jimenez argues that the "collective knowledge" doctrine is inapplicable here because Trp. Vitale indicated to Trp. DiCrescenzo that he should establish his own basis for the motor vehicle stop. In other words, because Trp. Vitale did not want Trp. DiCrescenzo to stop the NJ Lexus based solely on the information provided to him – because it would have compromised a months-

long DEA investigation – Jimenez argues that (1) Trp. DiCrescenzo was not part of the investigation and (2) Trp. Vitale specifically disavowed Trp. DiCrescenzo of the benefit of the "collective knowledge" doctrine. Both of these arguments are without merit.

First, Jimenez's argument that the "collective knowledge" doctrine cannot apply because prior to the call from Trp. Vitale, Trp. DiCrescenzo was not "involved" in the investigation makes no sense. Certainly at the point that Trp. Vitale enlisted Trp. DiCrescenzo's assistance, Trp. DiCrescenzo became "involved" in the investigation. Nothing in the case law the government has reviewed suggests a minimum time an officer must be "involved" to be sufficient. Indeed, the government submits that the requirement that the officer to whom the knowledge is imputed be "involved" in the investigation is to preclude imputing knowledge after-the-fact to justify an otherwise illegal stop. Cf. Terry, 392 U.S. at 21-22 (in making reasonable suspicion determination, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer *at the moment of the seizure or the search* 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"); United States v. Ienco, 182 F.3d 517, 524 (7th Cir. 1999) (discussing that reasonable suspicion must exist at the time of the stop; "it cannot come after the fact"). The car stop here was not a situation where Trp. DiCrescenzo acted wholly independently and the "collective knowledge" doctrine was used to try to establish reasonable suspicion after-the-fact. Rather, Trp. DiCrescenzo acted at the direction of Trp. Vitale, and is entitled to the benefit of the collective knowledge of the DEA, with whom Trp. Vitale was a task force officer working on the investigation of the individuals in Leominster. See United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002) (common sense that "where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop"); Am, 564 F.3d at 31 ("collective knowledge"

doctrine applicable where officer who conducted stop happened to see defendant walking down the street after having received a briefing from a detective that defendant was involved in a shooting); Cf. United States v. Hensley, 469 U.S. 221, 231 (1985) (police may justifiably rely on wanted bulletin issued by neighboring department).

Second, Jimenez's argument that Trp. Vitale specifically disavowed Trp. DiCrescenzo of the benefit of the "collective knowledge" doctrine by instructing the trooper to establish his own basis for the stop is equally unavailing. The fact that Trp. Vitale made this request so as to preserve the on-going drug investigation does not mean that Trp. DiCrescenzo lacked reasonable suspicion to make the stop. See United States v. Norton, 2016 WL 3012295, *3 (N.D. Ind. 2016) (rejecting defendant's contention that because the car stop was "walled off" from the remainder of the drug investigation, "collective knowledge" doctrine inapplicable to impute knowledge of drug investigation as basis for stop). In Williams, the defendant made a similar argument, which the Seventh Circuit found unavailing:

> Williams attempts to distance his case from *Rodriguez* and *Celio* based on Guiterrez's instruction that Simon develop his own probable cause to stop and search the Suburban. According to Williams, that statement precluded Simon from relying on the DEA's knowledge, and therefore Simon could not have been acting in objective reliance on the information he received from Gutierrez, as is required for application of the collective knowledge doctrine. We disagree with Williams's characterization of the instruction. Gutierrez did not forbid Simon from relying on the information collected by the DEA task force. Rather, Gutierrez sought to conceal the existence of the DEA investigation and wire taps from Williams and Howard. That effort has no impact on the fact that the DEA agents had probable cause, on which Simon was entitled to rely.

Williams, 627 F.3d at 253.

Here, too, Trp. Vitale's instruction that Trp. DiCrescenzo develop his own basis for stopping the vehicle was not a prohibition on relying on the information imparted to him; rather, it was an

attempt to conceal the ongoing DEA investigation. Jimenez's argument that the "collective knowledge" doctrine does not apply is without merit.

**III. The Scope of Trp. DiCrescenzo's Actions During the Stop was Reasonable**

Once a motor vehicle has been lawfully stopped, officers may order the driver and other occupants out of the vehicle without violating the Fourth Amendment. See Pennsylvania v. Mimms, 434 U.S. 106, 111, n.6 (1977) (pertaining to drivers); Maryland v. Wilson, 519 U.S. 408, 415 (1997) (pertaining to passengers).

Citing Rodriguez v. United States, 135 S.Ct. 1609, 1612 (2015), Jimenez argues that once Trp. DiCrescenzo had determined that there were no active warrants and that Jimenez had a valid license and the vehicle was properly registered, the trooper impermissibly extended the stop in violation of his Fourth Amendment rights. In Rodriguez, the Court concluded absent reasonable suspicion, extension of the traffic stop even for a few moments to enable a drug-sniffing canine to walk around the car is impermissible. This case is markedly different. As discussed, Trp. DiCrescenzo had, at a minimum, reasonable suspicion that the occupants of the car were engaged in criminal activity. Accordingly, the actions he undertook after checking on the issues relating to the traffic stop were entirely appropriate.

Jimenez next argues that his detention escalated into a *de facto* arrest, thus requiring Trp. DiCrescenzo to provide him with *Miranda* warnings. "At their inception, *Terry* stop generally do not require *Miranda* warnings." Arnott, 758 F.3d at 45; see United States v. Streifel, 781 F.2d 953, 958 (1st Cir. 1986) (recognizing that "as a general rule, *Terry* stops to not implicate the requirements of *Miranda*, because *Terry* stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates *Miranda*

warnings"). Rather, *Terry* stops "afford officers some latitude to question witnesses about issues for which the officers have reasonable suspicion." Id.

As noted, from the outset of Trp. DiCrescenzo's interaction with the defendants, his suspicions were aroused. When Trp. DiCrescenzo approached the vehicle, Jimenez's hands were visibly shaking, and Cruz-Rivera was staring straight ahead, refusing to make eye contact, and fidgeting in his seat. While the trooper spoke with Jimenez, Cruz-Rivera continued to fidget and refuse to make eye contact. When Jimenez was removing his license from his wallet, the trooper could see his hand tremble. Although nervousness alone, and viewed in a vacuum, may be insufficient to elevate suspicions, when viewed in the totality of circumstances here, it justified Trp. DiCrescenzo's further questions. See United States v. Mendonca, 682 F.Supp.2d 98, 106 (D. Mass. 2010) ("A traffic stop is not necessarily limited to its initial scope. It is an ongoing process and 'the propriety of an officer's actions after an initial stop depends on what the officer knows (or has reason to believe) and how events unfold.'") (citations omitted); Ruidiaz, 529 F.3d at 29 (noting that "*Terry* stop is not necessarily a snapshot of events frozen in time and place. . . . As the investigation proceeds . . . the officer 'may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention.'"); Chhien, 266 F.3d at 6 ("Importantly, an officer may gradually shift her focus and increase the scope of her investigation if her suspicions mount during the course of the detention.").

In this case, the trooper's subsequent questions were tied directly to the issues about which he had probable cause, or at a minimum, reasonable suspicion – namely, where the occupants had been, who they had met with (and the identity and location of the meeting), whether they had made other stops, whether there were guns, drugs or large amounts of cash in the car. Despite Jimenez's claims to the contrary, such questions under the circumstances were entirely routine and reasonable.

Chhien, 266 F.3d at 9 (concluding that questions regarding travel, unrelated to purpose of original stop, were lawful under the circumstances where suspicions raised during initial questioning). "Routine questioning of this sort, even when not directly related to the violations that induced the stop in the first place, is not uncommon during a highway stop." Id. An officer may "make reasonable inquiries of the suspect designed to confirm or dispel his suspicions." United States v. Woodrum, 202 F.3d 1, 6 (1st Cir. 2000); see Arnott, 758 F.3d at 45 (concluding that questioning tied to legitimate discovery of contraband on the defendant justified additional questioning relating thereto; "the questioning did not approach (let alone cross) the outer bounds of a *Terry* stop).

Jimenez argues that "the conditions of the interview can escalate the stop into custody, necessitating *Miranda* warnings." Motion at p. 11. While a valid investigatory stop can "escalate into custody," thus requiring *Miranda*, see United States v. Fornia-Castillo, 408 F.3d 52 (1st Cir. 2005), the circumstances surrounding the stop here could not be viewed as the functional equivalent of an arrest by a reasonable person. United States v. Campbell, 741 F.3d 251, 267 (1st Cir. 2013). The "ultimate inquiry" is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Thompson v. Keohane, 516 U.S. 99, 112 (1995) (quotations omitted); see Fornia-Castillo, 408 F.3d at 63 (*Terry* stop can escalate to arrest "where the totality of the circumstances shows that a reasonable person would understand that he was being held to 'the degree associated with a formal arrest'") (citations omitted); United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001) (noting that no "scientifically precise formula" can determine whether a *Terry* stop escalates to a formal arrest). The four-factor test is objective: (1) "whether the suspect was questioned in familiar or at least neutral surroundings"; (2) "the number of law enforcement officers present at the scene"; (3) "the degree of physical restraint placed upon

the suspect"; and (4) "the duration and character of the interrogation." United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011); see Campbell, 741 F.3d at 266.

Here, both defendants were questioned at the side of the road, in a neutral location. United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999) ("public highway is a neutral setting that police officers are not in a position to dominate as they are, for example, an interrogation room at a jailhouse"). Initially, only Trp. DiCrescenzo was present, and although another trooper arrived on the scene, and ultimately a third trooper with a K-9, it was only Trp. DiCrescenzo who questioned Jimenez. There is nothing to suggest that this was overwhelming or would cause a reasonable person to believe he was not free to leave. Campbell, 741 F.3d at 267 (no *de facto* arrest where 4 to 5 officers split up and questioned the three defendants separately). There was no physical restraint of either defendant; Jimenez was asked to sit in the cruiser and he consented. See United States v. Dunbar, 553 F.3d 48, 56 (1st Cir. 2009) (placing suspect in back of cruiser while officer wrote traffic citation did not transform stop into *de facto* arrest); Flowers v. Fiore, 359 F.3d 24, 30 (1st Cir. 2004) (detention of suspect in back of cruiser, with an officer in close proximity, does not turn stop into *de facto* arrest). Where the use of handcuffs does not necessarily transform the stop into a *de facto* arrest, see United States v. Rabbia, 699 F3d 85, 92-93 (1st Cir. 2012) (brief prophylactic use of handcuffs did not transform stop into an arrest), consent to sit in the cruiser should not either. Finally, although the duration and the character of the stop appropriately changed as circumstances developed, Ruidiaz, 529 F.3d at 29 ("officer 'may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention'"), there is nothing to suggest that the duration and character of the questioning would have caused a reasonable person to believe he was held to "the degree associated with a formal arrest." Thompson, 516 U.S. at 112.

**IV. A Warrantless Search of the Vehicle was Supported by Probable Cause**

Even if there was not probable cause to stop the vehicle, it most certainly existed based upon the additional information Trp. DiCrescenzo learned during the stop itself: (1) Jimenez and Cruz-Rivera indicated repeatedly that they had been in Lawrence and had come from Lawrence (despite the fact that they had come from Leominster), (2) Jimenez and Cruz-Rivera stated that they made no other stops in coming from Lawrence (despite the fact that they had come from Leominster), (3) Jimenez provided inconsistent answers to who he had been visiting in Lawrence, telling Trp. DiCrescenzo first that he was visiting his cousin, and later saying he was visiting his brother-in-law, who he could not name, (4) Jimenez could not provide a location where he had purportedly met his family member(s) in Lawrence, (5) both occupants were nervous; Jimenez was shaking and Cruz-Rivera was fidgeting and avoiding eye contact; (6) Cruz-Rivera was evasive about how much money was in the car, and at one point stated that there was $1000; (7) Cruz-Rivera consented to show the trooper the money, but attempted to shield the trooper's view of the backpack that he reached for and in; and (8) Trp. DiCrescenzo saw bundles of cash inside a manila envelope inside the backpack, bundled in a way consistent with drug proceeds.

The information developed during the traffic stop gave rise to probable cause, thereby justifying Trp. DiCrescenzo's warrantless search of the NJ Lexus. United States v. Bizier, 111 F.3d 214, 216-20 (1st Cir. 1997). Moreover, Jimenez consented to a search of the vehicle. United States v. Dunbar, 553 F.3d 48, 57 (1st Cir. 2009) ("At any point prior to an arrest, an officer may search a suspect's vehicle without a warrant if the suspect consents to the search."). Despite Jimenez's complaints in his Motion that he was merely acquiescing to authority, see Motion at pp. 13-15, consent is voluntary if it is "the product of an essentially free and unconstrained choice." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973) (citation omitted). There is no evidence that

Jimenez's consent to search the vehicle was not free or was constrained. Not only has Jimenez submitted no affidavit in support of his claim that his consent was involuntary, none of the facts in this case demonstrate any hint that Trp. DiCrescenzo "tricked, threatened, or bullied" him into giving consent. Chhien, 266 F.3d at 7 (consent to pat-frisk voluntary despite claims that "situation itself was inherently coercive (and, thus, that he could not have consented voluntarily)").

## V. Suppression of the CW's Photographic Identification of Jimenez Should Not Be Suppressed

Lastly, Jimenez claims that the CW's photographic identification of him should be suppressed because a single-photo identification poses a substantial likelihood of misidentification.

In United States v. Arthur, 764 F.3d 92, 99-100 (1st Cir. 2014), the First Circuit succinctly explained the parameters of eyewitness identification testimony.

> We begin with first principles: the Due Process Clause is implicated by the introduction of eyewitness identifications tainted by "suggestive and unnecessary" identification procedures. Perry v. New Hampshire, ––– U.S. ––––, 132 S.Ct. 716, 724, 181 L.Ed.2d 694 (2012). The resulting prohibition, however, cannot be applied with too heavy a hand. Identification evidence should be suppressed on due process grounds only in "extraordinary cases" in which the court "is persuaded that there was a very substantial likelihood of irreparable misidentification." United States v. Rivera–Rivera, 555 F.3d 277, 282 (1st Cir.2009) (internal quotation marks omitted). Unless "the indicators of [a witness'] ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion," the evidence, if otherwise admissible, should go to the jury. Perry, 132 S.Ct. at 725 (alteration in original) (internal quotation marks omitted).

764 F.3d at 99.

In considering the suppression issue, the first question is whether the identification procedure was impermissibly suggestive; if the answer is no, the inquiry goes no further. Id. "Suggest[iveness] in photo identification becomes impermissible only if it induces a very substantial likelihood of irreparable misidentification," and "it is only in extraordinary cases that identification evidence should be withheld from the jury." United States v.

Maguire, 918 F.2d 254, 264 (1st Cir. 1990). If, however, impermissible suggestiveness is found, the court must look to whether the identification was nevertheless reliable given the totality of the circumstances. Arthur, 764 F.3d at 99-100. In assessing reliability, courts focus on five factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; (5) the length of time between the crime and the confrontation.

United States v. Henderson, 320 F.3d 92, 100 (1st Cir. 2003) (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)).

Courts have routinely upheld the use of a single photograph in pretrial identification provided that the identification is reliable under the totality of circumstances. United States v. DeLeo, 422 F.2d 487, 497-98 (1st Cir.1970) (permitting single-photo identification because it was not "unnecessarily conducive to irreparable misidentification"); Otsuki v. Dubois, 994 F. Supp. 47, 58-60 (D. Mass. 2006) ("there is no *per se* rule of exclusion of out-of-court identifications made from a single photograph"); United States v. Nava-Ruiz, 515 F.Supp.2d 198, 203-06 (D. Mass. 2006) (permitting single-photo identification because it sufficiently satisfied four of the five Biggers factors).

In this case, regardless of whether the defendant can demonstrate that the single-photo identification procedure was impermissibly suggestive, he cannot show that the identification was unreliable under the totality of the circumstances and therefore cannot show a "very substantial likelihood of irreparable misidentification." See Simmons v. United States, 390 U.S. 377, 384 (1968); see also Brathwaite, 432 U.S. at 114 ("reliability is the linchpin in determining the admissibility of identification testimony").

Although the CW had not met Jimenez prior to October 4, 2013, the facts establish that Jimenez and Cruz-Rivera were at the 105/107 Garages with the CW for nearly 2 hours. During that time, Jimenez talked boastfully to the CW about how he drove and had his firefighter credentials with him in case he was stopped by the police, explaining that he would be left alone if he was ever stopped (A.00022). Jimenez spoke with the CW about the quality of the heroin while inside the garage (Id.). Undoubtedly, the CW had ample opportunity during this time period to view Jimenez. Cf. Brathwaite 432 U.S. at 114 (holding that "two to three minutes" was enough time for the witness to make a reliable identification); Johnson v. Dickhaut, 2009 WL 264142 *1, *4 (1st Cir.2009) (unpublished) (upholding an observation period of merely "five or six seconds").

Second, there is no evidence that the CW was anything but attentive during the time that Jimenez and Cruz-Rivera were at the 105/107 Garages. The third factor – the accuracy of the witness's prior description of defendant – is inapposite since there is no evidence that the CW had provided agents with a prior physical description of Jimenez prior to the identification. Courts have routinely found out-of-court identifications reliable under Simmons without a prior description of the defendant. U.S. v. Watson, 76 F.3d 4, 7 n1 (1st Cir. 1996) ("absence of a prior description by the witness does not necessarily render his or her subsequent identification suspect").

Jimenez argues that the CW's level of certainty (he was "pretty" sure the photo was Jimenez) demonstrates it is not reliable, while at the same time arguing that the CW had a motive to please law enforcement. To the contrary, however, that the CW did not identify Jimenez's photograph with absolute certainty demonstrates that the CW was not willing to identity whatever photograph they put in front of him. Finally, although the identification occurred nearly one year after the CW met Jimenez, the timeframe is well within the bounds set in cases upheld by the First Circuit where, as here, the remaining Biggers factors either support or are neutral regarding the

reliability of the identification. See, e.g., United States v. Flores-Rivera, 56 F.3d 319, 331 (1st Cir. 1995) (seven-year span between crime and identification permissible where other factors were persuasive); United States v. Drougas, 748 F.2d 8, 28 (1st Cir. 1984) (five-year span between crime and identification permissible.

Under the totality of the circumstances, this is not an extraordinary case in which there is a substantial likelihood of misidentification.

**CONCLUSION**

For all of the foregoing reasons, Defendant Jimenez's Motion to Suppress should be denied.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: */s/ Michelle L. Dineen Jerrett*
MICHELLE L. DINEEN JERRETT
Assistant U.S. Attorney
United States Attorney's Office
District of Massachusetts
Donohue Federal Building
595 Main Street
Worcester, Massachusetts 01608
Michelle.Dineen.Jerrett@usdoj.gov

Date: December 16, 2016

---

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Michelle L. Dineen Jerrett
Michelle L. Dineen Jerrett
Assistant U.S. Attorney

Date: December 16, 2016